KERLIN BROTHERS CO. v. TOLEDO.

1. CITY OF TOLEDO HAS POWER TO SELL NATURAL GAS PLANT.

Under paragraph 34 of sec. 1692, Rev. Stat., which confers upon municipal corporations the power "to acquire by purchase or otherwise and to hold real estate or any interest therein, and other property, for the use of the corporation, and to sell or lease the same," the city of Toledo has power to sell its natural gas plant.

2. POWER TO SELL SUCH PROPERTY VESTED IN COUNCIL.

By the provision in paragraph 34 of sec. 1692 Rev. Stat., that "in addition to the powers specifically granted in this title and subject to the exceptions and limitations in other parts of it, cities and villages shall have the general powers enumerated in this section and the council may provide by ordinance for the execution * * * of the same," the power to sell is vested in the council alone and the concurrence of natural gas trustees is unnecessary.

3. SALE MUST BE UNDER SECS. 1692 AND 2673a, REV. STAT.

The sale of such property must be effected under paragraph 34 of sec. 1692, Rev. Stat., and in accordance, so far as real estate is involved, with the limitation placed upon that section by sec. 2673a, Rev. Stat., requiring two weeks publication and a three-fifths vote of the council, in "any city or village which has not a board of improvements or board of public works," which includes Toledo.

Kerlin Brothers Co. v. Toledo.

**4. LEGISLATION SUFFICIENT FOR THE PURPOSE.**

To accomplish a sale in pursuance of Secs. 1692 and 2673a, Rev. Stat., an ordinance must be passed and published, but legislation, though denominated a resolution, accepting a bid for the property, made in pursuance of an advertisement therefor, and directing that the price bid shall be received and that proper conveyance shall be made, amounts to an ordinance and is sufficient for the purpose. (Hull, J.,dissents—opinion.)·

**5. FORM OF MUNICIPAL LEGISLATION IMMATERIAL.**

The form adopted in municipal legislation is not a matter of consequence. If a legislative act should be and in substance is an ordinance, and all the rules prescribed for the adoption or passage and publication of ordinances have been observed, the legislation takes effect as an ordinance and *vice versa* as to a resolution.

**6. RULE AS TO RESOLUTIONS OF PERMANENT NATURE.**

A resolution, although of a general or permanent nature, to come within the purview of sec. 1694, Rev. Stat., requiring a reading on three different days, or a suspension of the rules, must be a necessary resolution. It must not only be or provide for a necessary step toward the ultimate object, but it must be a step which cannot be otherwise taken.

**7. RULE APPLIED TO PRELIMINARY RESOLUTION.**

A preliminary resolution directing the city clerk to advertise for bids for the sale of part of a natural gas plant, the city reserving in the notice the right to reject any or all bids, amounts to a mere order or direction to the clerk, and is not a resolution of a general or permanent nature within the meaning of sec. 1694, Rev. Stat., requiring three readings or a suspension of rules. (Hull J., dissents—opinion.)

**8. NOT REQUIRED TO PURSUE UNNECESSARY FORMALITIES.**

Where the object to be attained could be accomplished by a mere motion or order and the city council adopts the form of a resolution, it is not thereby required to pursue further unnecessary formalities in subsequent proceedings.

**9. CONSTRUCTION OF BID CONTAINING THREE PROPOSITIONS.**

A bid, in response to an advertisement for the sale of a natural gas plant, setting forth that the bidder will pay a certain sum for the property outside the city, and another offer to pay a certain sum for the property inside the city, and still another distinct offer to pay a certain sum for the property inside and outside the city, although in one sense submitted as a single bid, in reality amounts to three separate bids, and particularly where a condition attached to the last bid relates to the operation of the whole plant. Therefore a sale of the outside property based on the first proposition is not invalidated by a condition attached to the last proposition.

**10. EFFECT OF ACCEPTING CONDITIONAL BID.**

The acceptance by a city council of a bid for the purchase of its natural gas plant, which bid was conditioned that the purchaser should have the right to operate the plant and to fix the price of gas in the city, did not give that right to the bidder, but amounted simply to an acceptance upon the condition that if the city and the bidder failed to come to an agreement upon a contract fixing the bidder's right to operate and the rates to be charged, the bid on the one hand and the acceptance on the other would fail.

**11. CONDITIONS CANNOT BE WAIVED BY ANOTHER COUNCIL.**

In view of sec. 1691, Rev. Stat., providing that a city council "shall not enter into any contract which is not to go into full operation during the term for which all members of such council are elected," a condition contained in an accepted bid for the purchase of a natural gas plant, providing that the bidder shall have the right to operate the plant and to fix the price of gas, cannot be waived by the bidder, so as to validate a sale, after the expiration of the terms of office of some of the members of the council which accepted the bid.

12. INSUFFICIENCY OF PRICE—RULE AS TO INTERFERENCE.

To justify a court in interfering with the action of a city council in a sale of the property of the city on the ground of insufficiency of the price, when the council has proceeded within the statutes, the price received must be so much less than would probably be obtained by again offering the property, as to establish clearly that the acceptance of the bid amounted to a reckless and improvident act. (Hull, J., dissents from holding sale valid under facts in this case—opinion.)

APPEAL.

PARKER, J.

Both this case and that entitled Toledo v. Toledo, come into this court by appeal from the court of common pleas, where they were begun. The evidence was submitted to this court in both cases at the same time, to be considered in either case or both cases, so far as competent and applicable to the issues; both were argued together, and therefore they will both be considered and decided at the same time.

These cases involve the general question of the validity of an alleged sale by the city to The Kerlin Brothers Company of a natural gas plant, the property of the city, consisting of a main pipe line, about forty-four and one-half miles long, extending from the city into and through Wood county and into Hancock county; about seven and one-half miles of lines of pipe connecting said main line with gas wells in said counties—all of said main and connecting lines being buried beneath the surface—certain gas leases in said counties, covering about two thousand acres; forty-seven gas wells and the equipment thereof; three pumping stations, located on small parcels of land owned by the city and consisting of buildings equipped with boilers, engines and pumps to force gas from said wells through said lines to the city; and a telephone line about forty-four miles in length; all of the property above mentioned lying outside of the city; and consisting also of the following described property within the city; something over ninety miles of pipe extending along and buried beneath the streets of the city and submerged beneath the river within the city, used in conveying gas to the inhabitants thereof for heat and light; also pipe and other supplies on hand not in use, and tools and office furniture.

The first case is an action of replevin brought by the Kerlin Brothers Company, a corporation, against the city of Toledo alone, to recover possession of all the pipe in the lines outside of the city and in the wells outside of the city, and some other property, the plaintiff claiming that it is entitled to possession as owner thereof. The city, through its attorney, who appears to be the city solicitor—and I make that remark for the reason that the answer does not disclose that the attorney is the city solicitor—files an answer and cross-petition reciting all the steps taken by the Kerlin Brothers Company and the city in the matter of the alleged sale, pointing out certain alleged irregularities which it contends vitiated the proceedings, and also alleging that said attempted sale was for a price so far below the real value of said property, and was so ill-advised, in view of the losses likely to result to the city, that the transaction amounted to abuse of corporate power on the part of the council acting in the premises for the city, within the purview of sec. 1777, Rev. Stat., and that therefore the alleged sale was null and void.

This pleading closes with a prayer that the plaintiff may be enjoined from taking possession of the property and from taking any farther steps in the premises in pursuance of the transactions respecting said pipe line

theretofore carried on and yet pending between plaintiff and the city council. The question whether the city solicitor prosecutes this cross-petition under sec. 1777, Rev. Stat., has been discussed by counsel, but we do not deem it necessary to pass upon the question, and therefore shall not do so. We hold that the answer presents an issue as to the ownership and right of possession of this property, and that the issues made by this cross-petition and the reply thereto are brought into this court by the appeal.

The other case is a suit brought by the city solicitor in the name of the city, under sec. 1777, Rev. Stat., against the city, all the members of the council and the mayor and clerk thereof and The Kerlin Brothers Company; and in the petition—which was filed on the same day that the cross-petition in the other case was filed—is set forth substantially the same facts as are averred in said cross-petition, and the same conclu-sions as to the illegality, irregularity and invalidity of the action taken by the city council on the one hand and The Kerlin Brothers Company on the other, to affect the alleged sale of the gas plant; and the prayer thereof is for an injunction against any farther action by the mayor or clerk of the city or said The Kerlin Brothers Company toward the accomplishment of the attempted sale of said property within the city and the real estate outside of the city, or the giving or taking of possession of any of said property within the city, or said real estate outside of the city, in pursuance thereof.

Issues were joined by answer and reply. It will be seen that the two cases cover all the property, each covering a part thereof. Though the pleadings are voluminous, covering fully the history of these transactions, the only controverted fact is that respecting the value of the property in question. I will state briefly the history of the transactions respecting this alleged sale.

Some time in July or August, 1899, a resolution was adopted by the common council authorizing the city clerk to adnertise the property for sale, and invite bids. Some time in August bids were received; the bid of one Bick for all of the property inside and outside the city was $256,000; the bid of the Northwestern Ohio Natural Gas Company for the same property was $228,000. The Kerlin Brothers company for the property outside of the city bid $86,000. While the question of the closing of the contract to the highest bidder was under consideration before the council, Samuel M. Jones, the mayor of the city, made an offer to the city of $300,000 for the property, including franchises similar to those involved in the so-called franchise ordinance in this case which the council undertook to pass for the Kerlin Brothers Company. These bids, as well as the offer of Mr. Jones, were rejected, and on November 13, 1899, a resolution was adopted directing the clerk to again advertise for bids. The resolution was offered on October 9, but after some vicissitudes, including its being vetoed by the mayor, was finally adopted November 13. It reads as follows:

" Resolved by the common council of Toledo, that the city clerk be instructed to advertise for bids for the sale of that part of the city of Toledo natural gas plant lying outside the city of Toledo. Bids will be received separately on that part lying within the city and that part outside the city."

This resolution was read on but one day by the board of aldermen, and was passed without suspension of the rule requiring a reading of ecrtain ordinances and resolutions on three different days; and the same

course was pursued when it was afterwards passed by the board of councilmen, by a vote of twenty-four ayes to two noes, over the veto of the mayor. In pursuance of that resolution the city clerk published in The Toledo Daily Commercial, a newspaper of general circulation in the city of Toledo, for two weeks, the following notice ·

## "NOTICE.

### "PROPOSALS FOR THE SALE OF THE CITY GAS PLANT.

"Sealed proposals will be received at the office of the city clerk of the city of Toledo, by the undersigned up to twelve o'clock (standard time) M. of Monday the fourth day of December, 1899, for the purchase of the separate parts of the city natural gas plant, as hereinafter mentioned, together with all its appurtenances, including all pipes, and connections laid in the city of Toledo, Ohio, pipe lines and connections elsewhere, together with all wells, rights in wells, tubing, and machinery, appliances, tools, materials, lands, leases, and leasehold interests now owned and held by said city in connection with its natural gas plant, with the right to lay down, maintain and operate in the streets, alleys and public places of said city, gas pipes and their connections, for the purpose of supplying natural and manufactured gas to consumers in said city. The purchaser to assume all obligations pertaining to such property and leases from and including the day of purchase.

"Separate bids will be received for the part of the natural gas plant, lying within the city limits, and for that part of the natural gas plant lying outside the city.

"Intending bidders can obtain a description of all said property owned or controlled by the city of Toledo, by calling upon the undersigned.

"Each bidder must deposit with his bid a certified check drawn on some Toledo bank, in the sum of $15,000, payable to the order of said city, and which sum shall become forfeited to said city in the event that said bidder refuses to enter into a contract in accordance with his bid within ten days after the same has been accepted, and the proper resolution passed by the city council conveying said property to said bidder. The city reserves the right to reject all bids, which may be offered.

"By order of the common council.

       "WILLIAM O. HOLST, City Clerk."

"In pursuance to said notice, two bids were filed before noon of December 4, 1899, as follows:

       "TOLEDO, OHIO, December 4, 1899.

"To the Honorable Common Council of the City of Toledo.

"GENTLEMEN: In response to your published invitation for bids, a copy of which is hereto attached, the undersigned will pay for all that part of the property of said city of Toledo, (as advertised) owned, used or connected with the city natural gas plant, as described in said advertisement and lying outside of the city, the sum of one hundred and two thousand and 00–100 ($102,000.00) dollars, and will pay for that property of the said city of Toledo, owned, (as advertised) used or connected with the city natural gas plant, as described in said advertisement, and lying within the city, the sum of one hundred and twenty-six thousand and 00–100 ($126,000.00) dollars.

" Or will pay for the whole of the said city natural gas plant and all parts and parcels thereof, whether lying within or outside said city, and as described in said advertisement, and shown by the description in said advertisement, the sum of two hundred and twenty-eight thousand and 00–100 ($228,000.00) dollars.

" This bid is made upon the following express conditions:

"That the city of Toledo, Ohio, if the undersigned so elect, will grant them by ordinance satisfactory to them, the right to continue to operate said city natural gas plant, and to take up the same. And to lay down and maintain gas pipes and their connections, and all necessary appliances to enable them to continue the supplying of gas to consumers in said city, in the same manner as is now done and proposed to be done by the present operation of said plant. Also fixing, satisfactory to them, the price they may charge to consumers for gas.

" The undersigned to assume only such obligations as arise from and after the date of purchase, but not to be liable for any obligations that have or may accrue or arise before said date.

"The amounts bid, to be paid in case of the acceptance of this bid, or any part thereof, within twenty days after the passage and legal publication of the necessary ordinances and resolutions conveying said property to the undersigned, and granting to them the right to furnish gas, fixing prices, etc., above referred to.

" A certified check on the National Bank of Commerce of Toledo, Ohio, in the sum of fifteen thousand ($15,000.00) dollars, payable to the order of said city deposited herewith.

　　　　　　　　　　" Respectfully submitted,
　　　　　　　　　　　　" THE KERLIN BROS. CO.
　　　　　　　　　　　　" By E. M. KERLIN,
　　　　　　　　　　　　　　　　　　Secretary."

There was also another bid, which I will not take time to read, by Charles D. Hauk, of $115,000, for the property inside the city, and of $90,000 for the property outside the city, and for the entire property, $205,000.00; and that was also accompanied by a certified check for $15,000.00.

On December 11, 1899, a resolution was introduced in the board of councilmen reading as follows:

" Resolution accepting the bid of The Kerlin Bros. Company for gas plant lying outside of city of Toledo.

" Resolved by the common council of the city of Toledo, Ohio, that the proposal of The Kerlin Bros. Company, for the purchase of all that part of the property (as advertised) owned, used or connected with the city natural gas plant, lying outside the city of Toledo, with its appurtenances including all mains, pipes, gas and oil wells, gas and oil leases, meters, materials, machinery, lands and appliances, appertaining or belonging to said plant or used in connection therewith at the price of $102,000.00, be, and the same is hereby accepted and upon the payment of the purchase money, the mayor and city clerk are hereby authorized and directed to execute and deliver to the said The Kerlin Bros. Company, proper deeds and conveyances of all of said property."

That resolution was duly passed, and, after being vetoed by the mayor, was again passed by a two-thirds vote of the council, as provided by law, and was duly published as required by statute in the case of ordinances, on February 15 and 16, 1900.

At the same date that this resolution was introduced, another, identical in form, with respect to the inside property, was introducèd, and that was passed in the same way, but I think perhaps a few days later; at all events, it was duly passed and published.

On February 26, 1900, there were introduced in the board of aldermen of said city, two ordinances : one, which has been called in argument the " franchise ordinance," providing that The Kerlin Bros. Company or assigns should have the right to operate this gas plant under certain restrictions and according to certain regulations provided in the ordinance. That ordinace was passed March 5, 1900. The other ordinance was one fixing the maximum rate at which the company might sell gas, if they should operate the plant; and that has been described in the arguments as the " Rate ordinance." That was also passed March 5, 1900. Upon being presented to the mayor for his approval, both of these ordinances were vetoed. Therafter, and during the life of this council, the rate ordinance was again brought up for passage and defeated; that is to say, it failed to receive the necessary votes to pass it over the veto of the mayor. The franchise ordinance was passed by the necessary vote, but not in time to permit of its being published and taking effect within the life of that council, the terms of certain members expiring before there could be due publication of the ordinance. No ordinance has ever been adopted by the common council of the city of Toledo fixing the price that said The Kerlin Bros. Company might charge in the said city of Toledo for gas. After the final passage of the above resolution purporting to accept the bid of The Kerlin Bros. Company for the outside plant, and before the introduction or passage of the ordinances above referred to—that is, the rate and franchise ordinances—The Kerlin Bros. Company filed with the common council of Toledo, Ohio, a written acceptance of the same as to the part of the plant lying outside of the city of Toledo, and therein signified its willingness and readiness to pay, and tendered to said city the amount called for in said resolution, namely, the sum of $102,000.00. Most of these facts I have stated from the agreed statement of facts submitted to us by counsel.

A written acceptance of the resolutions, both as to the parts of the plant lying within and those lying outside of the city, signifying its readiness and willingness to pay to the city the amount called for in said resolutions, was filed by the Kerlin Bros. Company with the council, and paying in orders were demanded, which were refused by the city auditor. This was before either the rate ordinance or the franchise ordinance had been introduced.

On March 9, which was after both these ordinances had passed both the boards of council and were in the hands of the mayor, the Kerlin Bros. Company laid a written communication before the common council, to-wit :

" TOLEDO, ÔHIO, March 9, 1900.

" To the Honorable Common Council of the City of Toledo, Ohio.

" GENTLEMEN : The undersigned, The Kerlin Bros. Company, of Toledo, Ohio, hereby give you notice that they have accepted and do hereby accept the terms and conditions of certain legislation, passed by your honorable body on the 15th day of January, 1900, selling to them all that part of the property of the city of Toledo, owned, used or connected with the city natural gas plant, lying outside of the

Kerlin Brothers Co. v. Toledo.

city of Toledo, with its appurtenances, including all mains, pipes, gas and oil wells, gas and oil leases, meters, materials, machinery, lands and appliances appertaining or belonging to said plant or used in connection therewith as described in said legislation.

"We hereby waiving any conditions in our bid, expressed or implied, as to the sale of the property above described, which may require the granting to us of a franchise to sell gas in the city of Toledo, and fixing the price thereof.

"Very respectfully,
"THE KERLIN BROS. COMPANY,
"By R. G. KERLIN, President."

And on the next day, March 10, the company paid into the city treasury the sum of $102,000.00, and took from the treasurer the following receipt:

"City Treasurer's Office,
"TOLEDO OHIO, March 10, 1900.

"Received from The Kerlin Bros. Company to be placed to the credit of the sinking fund, one hundred and two thousand and 00–100 dollars ($102,000.00) for purchase of gas plant (outside).

"JOS L. YOST, Treasurer.
"F. S. HODGMAN, Deputy."

On April 5, the common council passed this resolution:

"Resolved by the common council of Toledo, that the common council of Toledo, having by proper legislation, sold to The Kerlin Bros. Company, all that part of the natural gas plant of said city outside of said city, described in said legistation at and for the sum of one hundred and two thousand dollars. And said The Kerlin Bros. Company having paid into the treasury of said city, said sum of $102,000, and the same having been accepted by said city, and said The Kerlin Bros. Company being now the owner of said described property and the said city is incurring great damages, therefore, the natural gas trustees of the city of Toledo are hereby authorized and directed to surrender and deliver possession of all of said property, including all real estate included therein, to said The Kerlin Bros. Company.

"And the city clerk is directed to send a copy of this resolution to said natural gas trustees at once upon its passage.

"Adopted April 5, 1900.

Attest:
"WILLIAM O. HOLST, City Clerk."

Said money is still in the possession of said city.

On March 10, 1900, The Kerlin Bros. Company addressed and sent to the mayor, the Hon. S. M. Jones, a letter upon the subject, reciting what had been done in the matter of paying in the money, etc., and demanded of him that he execute and deliver to the company a deed of conveyance of said property, as provided in said legislation.

On April 18, 1900, which was after the expiration of the terms of many of the members of the council under which this effort to sell was inaugurated, the Kerlin Bros. Company filed with the city clerk the same waiver of all conditions with respect to franchise or rate ordinances, in so far as the same might pertain to the inside property, and agreed to pay $126,000 therefor without regard to such legislation. The exact facts as to the expiration of the terms of certain members of the council

and certain other pertinent facts are set forth in this agreed statement as follows:

"The term of office of eight members of the board of aldermen, who were in office on March 28, 1900, expired on April 9, 1900, on which said last mentioned date their successors in office duly qualified and a new board of alderman of the common council of the city of Toledo, was then duly organized by the election of a president and vice president. That the term of office to which they had been elected of fifteen members of the board of councilmen of the common council of the city of Toledo, who were in office on April 11, 1900, expired on said last mentioned date and their respective successors in office then duly qualified as members of the board of councilmen, of said city of Toledo, and thereafter and on April 11, 1900, the new board of councilmen, of said city organized by the election of a president and vice president.

"No proceedings have been taken or attempted to be taken by the common council, or any board of officers of the city of Toledo, in relation to the sale or disposal of any part of the natural gas plant or of any of the property in question in these cases, except as herein-above set forth.

"Neither the mayor nor the city clerk, of Toledo, has executed and delivered to the said company, any deed or other conveyances of any of said gas plant property, or of any of the property in question as aforesaid. That the natural gas trustees, of the city of Toledo, have never consented to or taken any steps towards the sale of any of said property.

"The common council of the city of Toledo, has never adopted any general ordinance providing for the exercise of the power conferred on the said city of Toledo, by sec. 1692, Rev. Stat., for the sale of the property in question, or any other property of the city of Toledo. No vote of the electors of Toledo has ever been had authorizing the sale of the property, or any part thereof."

Then follows in the agreed statement of facts a schedule of the property which I have described in general terms.

I will proceed to discuss briefly certain of the questions in the case which affect the validity of this alleged sale, taking up the objections urged on behalf of the city, and, (if the taxpayers are represented here,) on behalf of the taxpayers of the city.

1. First, it is insisted that the city has no power to sell this property at all. The statute providing for the establishment, erection and operation of this plant, is found in 86 O. L., 7, and there have been some subsequent amendments, I believe.

In Thompson v. Nemeyer, mayor, 59 Ohio St., 486, where the Supreme Court had under consideration a similar statute affecting the city of Findlay, and in which case was presented for determination the question whether the city of Findlay had power to sell its natural gas plant, it was held and decided by that court that under sec. 1692, subdivision 34, Rev. Stat., a city or village has power to sell its gas plant. As I shall have occasion to refer to this section several times in the course of this opinion, I will now read the part referred to.

"In addition to the powers specifically granted in this title, and subject to the exceptions and limitations and in other parts of it, cities and villages shall have the general powers enumerated in this section, and the council may provide by ordinance for the exercise and enforcement of the same."

Then follow paragraphs which are numbered from one up to forty, in which are set forth the subjects respecting which the council may provide for the exercise of this power; and among them paragraph 34, the one referred to by the Supreme Court in the case I have cited, and reading :

"To acquire by purchase, or otherwise, and to hold real estate, or any interest therein, and other property for the use of the corporation, and to sell or lease the same."

Without stopping to point out the difference between the act then under consideration by the Supreme Court respecting the gas plant of the city of Findlay and the law respecting the natural gas plant of the city of Toledo, we simply say that we find no material difference between the two acts touching the authority to sell. Something more may be said upon that subject farther along.

2. The second question raised is as to what officers or body may make the sale; it being contended on behalf of The Kerlin Brothers Company that the power is lodged with the common council; and it being contended on behalf of the city—or at least on behalf of the gas trustees, who are represented here by counsel though they are not parties to either action—that if the city has power to sell at all, the sale must be made by the gas trustees, or by the concurrent action of the gas trustees and the common council.

By sec. 1692, paragraph 34, Rev. Stat., authority is conferred upon cities to sell, and authority is conferred upon the common council to provide for the exercise of this power. The making of a sale of any kind involves a contract of sale. The power to contract is, by section 1693, Rev. Stat., placed in the council, and it is therein provided that this power shall be exercised through the medium of an ordinance or resolution ; and therefore we conclude that sec. 1692, paragraph 34, Rev. Stat., wherein it is provided that the council may provide for the exercise of said power, fairly construed or paraphrased, means that the council may exercise this power of sale through the medium or instrumentality of an ordinance; and we hold that the trustees need not concur in this action. No provision is found limiting the authority of the council in the premises or providing that the concurrence of the trustees shall be required. It is provided in sec. 2675, Rev. Stat., with respect to the sale of school property, or waterworks, or hospitals, infirmaries, etc., that the trustees having charge of those different properties and works shall concur; that is to say, that their concurrence in the action of the council shall be required in order to effectuate a sale of such properties; but we find no such provision with respect to natural gas trustees; and we think that the fact that this provision is found with respect to these other properties and boards and not with respect to the natural gas trustees, affords a very potent argument in support of the contention that the concurrence of the gas trustees is not required.

Much has been said about the inexpediency and injustice of the provision which permits the council to take this particular property in charge and sell it and thereby deprive the city thereof,—taking it away from the trustees to whom the property and its management have been entrusted, and by the same act in effect depriving the trustees of their offices and the emoluments thereof, without their being consulted in the matter at all; but with that question we apprehend we have no business; that is a question of legislative policy, and the legislature having so provided,—whether

wisely or unwisely we will not pretend to say—to the law as we find it we must give effect.

Section 2491*d*, Rev. Stat., passed subsequently to the original statute on the subject, has been called to our attention in this connection. That section provides, "That in any city of the third grade of the first class "which described Toledo" in this state is, or hereafter may be lawfully engaged in the production and sale of natural gas, and whilst so engaged produces or procures any petroleum or rock oil, or lands or leases containing such oil, the natural gas trustees of such city are hereby authorized to operate or sell such wells, lands or leases as they may deem best."

And it further provides as to the disposition to be made of the funds arising from such sale. This is perhaps worthy of some consideration as indicating at least the legislature's opinion of the power of the trustees in the premises. If the legislature had thought that the trustees had general power to sell of course this section would not have been adopted. This action on the part of the legislature amounts to a legislative construction of the laws in force to the effect that they conferred upon the trustees no power to sell. Thompson v. Mayor, etc., *supra*, in our judgment fairly decides that in that case at least—and we conclude that if it is so in that case it is so in this—the power is vested in the council alone, because the decision is to the effect that the power of sale is found under sec. 1692, subdivision 34; and these powers cannot be delegated, but must be exercised by the council through the medium or instrumentality of ordinances or resolutions.

3. The third question arises, as to how and under what statutes this authority to sell must be exercised.

We have already indicated that this must be done under sec. 1692, paragraph 34; but, with respect to real estate, the authority of the council under that section is limited by sec. 2673*a*.

As to what is "real estate" within the meaning of the municipal code, some light is given by sec. 1536, Rev. Stat., and I read the part thereof defining real estate, to-wit:

"In the interpretation of this title, unless the context shows that another sense was intended * * * property includes real, personal and mixed estates and interests; and "land" and "real estate" include rights and easements of an incorporeal nature, but this enumeration shall not be construed to require a strict construction of any other words in this title."

So that perhaps, under that definition, within the municipal code, "real estate" covers rather more than it would under the general definition of the law. We have held that gas and oil leases, for certain purposes and in certain aspects, including the right of the sheriff to sell upon execution, are to be treated as personalty. It is very doubtful whether within the purview of this section such leases could be regarded as personal property, since they involve rights and easements, (as this court has held), of an incorporeal nature.

Now coming to sec. 2673*a*, Rev. Stat., which, as I have said, in our opinion limits sec. 1692, paragraph 34, in so far as "real estate" is concerned, that provides "That the council of any city or village, which has not a board of improvements, or board of public works"—(and that includes this city) "shall have power, three-fifths of all the members elected thereto voting therefor, to offer for sale or lease any real estate and appurtenances belonging to such city or village, and place the pro-

ceeds arising therefrom to the credit of such fund or funds as to said council may seem proper ; provided that invitation of written bids for such sale or lease shall be first published for two weeks in some newspaper of general circulation in such city or village, and the sale or lease shall be awarded to the highest and best bidder, but all bids may be rejected and said council may at any time within twenty days after opening such bids award the sale or lease privately to any person at a price not less than the highest bid received; or such lease or sale after similar notice may be made by public auction ; and provided further, that said council may until such invitation and award or auction, lease any of said property from month to month upon such terms as they choose, without advertisement so as to produce revenue."

So it will be seen that in order to sell real estate a three-fifths vote of the members of the council and an advertisement for two weeks are required.

With respect to a part of this property at least, it is clear that the proceedings must be under sec. 2673a, Rev. Stat.

4. A question is raised as to the validity of the preliminary legislation which was adopted by the council directing the clerk to advertise for bids. As I have stated, this resolution was passed without a suspension of the rules requiring a reading on three different days, as provided by sec. 1694, Rev. Stat., with respect to resolutions and ordinances of a general or permanent nature.

It is contended on behalf of the city that this is a resolution of that nature, and that, therefore, such reading or suspension of the rules was required.

'On behalf of The Kerlin Brothers Company, it is insisted that it is not a resolution of that character. This is an important question in the case. We are of the opinion that if it is a resolution of a general or permanent nature, and is a resolution required to be adopted as one of the necessary preliminary steps for the sale of this plant, the subsequent proceedings lack the necessary foundation or basis to make them legal and to make the sale valid. But the majority of the court are of the opinion that this is not such a resolution as is required by section 1694, to be read on three different days.

It will be observed that this resolution is simply an order or direction to the city clerk to advertise for bids ; in other words, to put an advertisement in a paper, as required by sec. 2673a, Rev. Stat., to advise all persons interested in a sale of this property that bids will be received by the common council. In the advertisement based upon this resolution it is provided that all bids may be rejected by the council, so that the highest bidder under this advertisement or invitation does not acquire any right as against the city to have the property awarded to him upon his paying the amount of his bid. The statute contains the same provision. Therefore this resolution or action is not binding upon the city.

We do not undertake to say that the subject-matter to which this legislation pertains is not of a general or permanent nature; we think it is, notwithstanding the transitory and elusive and somewhat disappointing character of natural gas, but we do not regard that as decisive of the question. Manifestly the value or importance of the property or interests involved can have no influence upon the legal question now under consideration. The statute makes no distinction based on value or quantity of property involved. If such a resolution respecting the sale of a pipe line or other property worth a million or more dollars must be passed

with the formalities required by sec. 1694, Rev. Stat., it follows that if the property to be sold were worth but a trifling amount the same formality must be observed, so that no force can be added to the argument that such formality was required in this case by the statement that the property involved is very valuable. And if the proposition that the resolution is of a permanent nature is based upon the fact that the ultimate object, i. e., a sale and permanent transference of title, has in it the element of performance, the same can be said, with equal truth and force of a sale of a worn-out shovel or pick, or other article of small value, solely on the ground that this property is of a permanent character, without respect to its value as we hold that the subject matter of the legislation was of a permanent nature.

It is said by the Supreme Court in Campbell v. Cincinnati, 49 Ohio St., 469, with respect to the ordinances there under consideration: "The subject-matter of the ordinances was of a permanent nature—the same test we would apply in making the character of a law as general or local, to depend on the character of its subject-matter." But it will be seen that in that case, as well as in every other case, so far as our search has informed us, in which it has been held that an ordinance or resolution under consideration was governed by sec. 1694, Rev. Stat., as to the mode of passage, such ordinance or resolution was required as a step, as a prerequisite, as a condition precedent in the carrying out of the object in view, and it was also required that such step should be taken by resolution or ordinance and not otherwise.

Another case which has been cited is Elyria Gas & Water Co. v. Elyria, 57 Ohio St., 374. In that case it was held that a resolution providing for the taking of a vote of the citizens to determine whether or not bonds should be issued, was a resolution of a general and permanent nature within the meaning of sec. 1694, Rev. Stat., and the court puts the decision upon the ground that the adoption of such resolution is a step to be taken in the accomplishment of the ultimate purpose. But it will be observed that in that case also, the statute expressly requires that such a step shall not only be taken, but shall be by resolution; section 2837 providing that: "Whenever the trustees of any township or hamlet, or the council of any municipal corporation shall by resolution declare it necessary to issue and sell the bonds of such township, hamlet or municipal corporation," etc., then they may proceed to the other steps pointed out.

In Upington v. Oviatt, 24 Ohio St., 232, the resolution was required. That was a proceeding to condemn property, and a resolution setting forth the necessity of condemning the property was required by the statute. It was held that the resolution was not required to be read or passed by the formalities required by sec. 1694, Rev. Stat., because it was a resolution declaratory of the existence of a fact, and declaratory of a purpose, and was not of the nature of legislation providing for future action.

Ordinarily, all that is required to effect a sale of property is an offer by the purchaser and acceptance by the seller, or an offer by the seller and acceptance by the purchaser, followed by payment or delivery. Those are the essential things to accomplish a sale. Where the sale is to be made by a municipality, certain formalities are required—it must be done in a certain way, and these rules which are prescribed, and these formalities which are required we think must be strictly and carefully observed in order to insure the validity of the transaction; but we do

Kerlin Brothers Co. v. Toledo.

not understand that it is the province of a court to undertake to prescribe any new or additional formalities—to require any other steps or formalities than those required by the statutes, even though the court may be of the opinion that other requirements and other steps would be advisable.

The majority or the court are of the opinion that a resolution, although of a general or permanent nature, to come within the purview of sec. 1694, Rev. Stat., must be a necessary resolution—a resolution required. If the same thing can be accomplished by a mere motion, and the council without necessity therefor adopts the form of a resolution—an unnecessary formality—it does not follow that the council thereby commits itself to a course which would require of it still farther formalities appropriate to resolution but not required in the case of motion; we are of the opinion that this direction or order to the clerk is not of the character of legislation. But, assuming that it is legislation, the statute provides, in section 1665, that the legislative acts of the council may be accomplished by ordinance, resolution or order. Now, suppose this order, on direction to the city clerk to advertise for bids, should be regarded as arising to the dignity of legislation, why may it not be accomplished by an order? And if by an order, what law is there requiring that such order shall be passed with the formalities required in section 1694? None that we know of. As we have already said, the observance of unnecessary formalities does not require of the council that it shall thereafter proceed consistently and therefore that it must follow to the end the path unnecessarily entered upon. Suppose the council 'had adopted an ordinance directing the clerk to advertise for bids —a thing which we conceive to be altogether unnecessary—would it follow that that ordinance involving merely an order or direction to the clerk to advertise for bids, could not take effect until it had been published, as required of ordinances of a general or permanent nature? We think not. We think that whether it is called an order, resolution or ordinance, it amounts simply to a direction to the clerk which might as well be accomplished by a mere motion.

Our conclusion upon this matter then is, that the resolution, to come within the purview of sec. 1694, Rev. Stat., must not only be or provi le for a necessary step toward the accomplishment of the ultimate object, but it must be a step that cannot be taken otherwise than by resolution.

5. The next question that we encounter is whether a precedent ordinance is required by sec. 1692–34, Rev. Stat., in order to make a valid sale of property—that section reading that the council may provide by ordinance for the exercise of powers. Must the council in some way provide for the exercise of the power before the power exercised? We hold that a fair reading of that provision is that the council may exercise the power through the instrumentality of an ordinance.

6. We are of the opinion that to accomplish a sale in pursuance of secs. 1693–34 and 2673a, Rev. Stat., an ordinance must be passed and published. The question, therefore, meets us, whether this legislation which is denominated a " resolution " accepting the bid of The Kerlin Brothers Company for the gas plant and directing that the price shall be received and that the proper conveyances shall be made, etc., is an ordinance and sufficient for the purpose. And upon this question the court is not unanimous, but a majority of the court is of the opinion that that is to all intents an purposes, and " ordinance."

In Blanchard v. Bissell, 11 Ohio St., 99, something is said by Judge Scott in the way of undertaking to distinguish between an "ordinance" and a "resolution." It was held in that case that the signature of a presiding officer—the mayor, I believe—was not necessary to the validity of the ordinance; and at page 103, this is said:

"Beside, we are not aware of any provision of the statute which requires a town council to levy taxes solely by ordinance. Such an act, by whatever name it may be called, is properly in the nature of a resolution. It is of a temporary character, and prescribes no permanent rule of government. And though clothed in the forms of an ordinance, it may well have the effect of a resolution without the signature of the presiding officer. "

In other words, it was not to be condemned because it was called an ordinance instead of a resolution. And we think the same rule applies where the instrument is in effect an ordinance, but is denominated a resolution. I have referred to this for the purpose of calling attention to the attempt of the learned judge to distinguish between an ordinance and a resolution. While the features indicated may, in a general way, be regarded as forming a very good basis for a general rule—yet when you attempt to apply such rule to ordinances and resolutions provided for by our statutes, it does not cover the subject. You cannot say that every legislative act that is denominated an ordinance, under our statutes, prescribes a permanent rule of government.

The statute expressly provides that a contract may be entered into by ordinance. Now, would any one pretend to say that such an ordinance which is a contract after it is passed—prescribes any rule of conduct or any permanent rule of government? It simply accomplishes the object in view—the making of the contract. In a contract of sale or purchase, for instance, the whole transaction is closed up by the ordinance. It is, in that sense, of a temporary character, although the results may be permanent, but it does not prescribe any rule of conduct for the people. And so with an assessment ordinance. It is required by the statute that upon certain improvements an assessment against the property shall be made by ordinance, which shall describe the property and shall set out the amount that shall be laid as an assessment upon each part. Of course it cannot be said with respect to such an ordinance that it prescribes a permanent rule of conduct for anybody. In that respect it is in the nature of a resolution, according to the general rule laid down by Judge Scott. Taxes must be levied by ordinance, and it cannot be said that an ordinance levying taxes—prescribing the rate for the year—is an ordinance prescribing a permanent rule of government; it also comes within Judge Scott's definition of a "resolution," since it is legislation of a temporary character. This confusion or uncertainty exists not only in Ohio, but elsewhere. There may be, and I believe there are, states in which it is prescribed by statute that an ordinance shall have certain formalities which shall distinguish it as an ordinance, as "Be it Ordained " etc., and that a resolution shall have certain formal parts, as " Be it Resolved," etc., but we have no such distinctions. The constitution of the state provides for the formal parts of a statute; so that we may determine whether certain legislation may be regarded as statutory, perhaps, by the presence or absence of the words, " Be it enacted," etc., but we have no law prescribing the forms of resolutions or ordinances. I think the general weight of authority is to the effect that the form adopted in municipal legislation is a mater of no consequence, but that

if a legislative act should be and in substance is an ordinance, and all the rules prescribed for the adoption or passage and publication of ordinances in order to have them take effect have been observed and complied with, it shall take effect as an ordinance, and *vice versa* as to a resolution. I want to call attention to a few cases on the subject:

35 Penn. St., 231. I read a paragraph from page 236:

"The next objection, that the order for opening was by joint resolution, and not by ordinance, seems to be disposed of by uniform legislative usage in the city government and by a fair analogy to the constitutional practice of the state legislature. Both joint resolutions and ordinances are passed by both councils, and approved by the mayor; and by the 17th and 18th sections of the act of 11th March, 1789, the laws, ordinances, regulations and constitutions of the city must be published and recorded; and by the 44th section of the consolidation act, the laws and ordinances of the city must be published for the information of the citizens. It is a legislative act, a law, and it matters not whether it be called a joint resolution or an ordinance."

I call attention to Kepner v. Commonwealth, 40, Penn. St., 130, but will not take time to go into the case farther than to read some short paragraphs, indicating the opinion of the court upon the general subject. Chief Justice Lowrie, in announcing the opinion, undertakes to distinguish between resolutions, ordinances, regulations, by-laws, etc,, and says, at page 129, 130:

"Certainly there is some distinction between these words in ordinary usage. Regulation is the most general of them, meaning any rule for the ordering of affairs, public or private; and it thus becomes the generic term from which all the others are defined, specified or differentiated. Ordinance is the next most general term, including all forms of regulation by civil authority, even acts of parliament. With us its meaning is usually confined to corporation regulations. Ordinances are all sorts of rules and by-laws of municipal corporations. Ordinary usage shows this, and it may be found illustrated in Willcock on Corporations, 73.

" Resolution is only a less solemn or less usual form of an ordinance. It is an ordinance still, if it is anything intended to regulate any of the affairs of the corporation. If the word " Ordinances " in the act of assembly, does not include such resolutions, the law that requires ordinances to be submitted to the mayor for his approval, is of no force at all, because it allows its substantial purpose to be defeated, by giving to ordinances the form of resolutions.

" What we have said cannot, of course, apply to rules of council properly so called, for these are mere rules of practice of the council itself in its deliberations, passed by virtue of an authority inherent in all associated functionaries, and implied when not expressly granted; and establishing the forms under which they act in the process of passing ordinances. They are not ordinances, but rules for passing ordinances.

" Ordinance, then, is the generic term for acts of council affecting the affairs of the corporation; and we can make no distinction between them founded on the difference of degree in which they affect those affairs. Such a distinction would necessarily be so indefinite as to give rise to great difficulties in practice, and involve the danger of frequent resorts to the courts to settle disputed questions, and of frequent legal controversies upon the validity of acts of councils, even after they may have been carried into effect."

First Municipality v. Cutting, 4 La., 335.

"It is no objection to the validity of an ordinance of one of the municipalities of New Orleans, containing a prohibition and attaching a penalty to its violation, that it purports by its terms to be a resolution."

Authorities to the same effect may be found in 1 Dillon on Municipal Corporations, 388; 45 N. J. 279, and 40 Wis. 204, are to the same effect, and we find no authority holding a contrary doctrine. There are cases where it is held that matters to be accomplished by ordinance cannot be accomplished by resolution, but in all such cases, so far as we observe, the resolutions in question were not passed and published with the formalities required of an ordinance, and that fact is emphasized by the court.

In the Case at bar each resolution accepting a bid contains every essential provision of contract of sale: *i. e.*, the provisions that the offer is accepted; that the purchase money shall be received and converted into certain funds, and that a certain conveyance shall be made.

Whether this is real or personal property, though much debated, it is not necessary to decide, since we hold that the requirements as to real estate have been complied with, and that is sufficient to cover personalty as well as real property.

7. Another question is whether the conditions in this bid invalidated the sale? It will be observed that the notice of sale sets forth that in addition to accepting bids for the property, bids will be received that will cover the "right to lay down, maintain and operate in the streets, alleys and public places of said city, gas pipes and their connections, for the purpose of supplying natural and manufactured gas to consumers in said city," etc. The bid of The Kerlin Brothers Company contains an offer to pay $102,000 for the property outside the city and another offer to pay $126,000 for the property inside the city, and still another distinct offer to pay $228,000 for the property inside and outside the city; and following that, it reads "this bid is made upon the following express conditions," and then follows what I have read therefrom as to the right to continue to operate the plant, the fixing of a satisfactory rate for gas, etc. Although in one sense this proposal submitted by the Kerlin Brothers Company is a single bid, yet when we come to distinguish between the different parts, there are in fact three bids submitted. We are of the opinion that a fair construction of the proposal is that the provision as to conditions applies to the last bid only, the bid for both the inside and outside parts; that it does not apply to the bid for the inside part alone nor to the bid for the outside part alone and we think that is made more clear by the provision that they shall have "the right to continue to operate said city natural gas plant, and to take up the same." Said natural gas plant was composed of property inside the city as well as outside the city. No *part* of it could be fairly described as "said natural gas plant," but these words describe the whole.

Again, they are to have the right to "maintain gas pipes and their connections, and all necessary appliances to enable them to continue the supplying of gas" (and the only gas they can *continue* to supply is natural gas) "to consumers in said city, in the same manner as is now done and proposed to be done by the present operation of said plant." They are to have the right to *continue* to supply gas *in the same manner as is now done;*" and that was done through the old pipe line in the field

and through Hancock and Wood counties and to and within the city of Toledo. So we are agreed that these conditions do not apply to and do not invalidate the bid as to the outside property alone.

That is the construction that we would put upon this contract, that is to say, upon this offer and its acceptance; but it evidently is not the construction that has been put upon it by the council and by The Kerlin Brothers Company with respect to the inside part. It may not have been the construction that they put upon it with respect to the outside plant, but that is not material because during the life of the council in which the proceedings were inaugurated, all of the conditions with respect to the outside plant were waived. The money was paid in, was accepted, and the council directed that the property should be delivered. With respect to the inside property, however, the case is different. The Kerlin Brothers Company and the council treated the conditions as applying to the inside part of the property until after the life of the council had expired. It is a familiar rule of construction of contracts that the court will be aided by and in many instances will follow the construction adopted by the parties themselves as indicated by their conduct. In view of the construction put upon this proposal by The Kerlin Brothers Company and by the city—in view of the fact that Kerlin Brothers & Company did not until after the legal death of this council, undertake to waive any of the conditions as to the inside plant, but were undertaking to have the franchise and the rate ordinances passed as a part of that which they had no right to insist upon, we hold that the bid and the acceptance thereof should as between said parties receive that construction, and that therefore the acceptance, so far as the inside plant is concerned, must be considered as a conditional acceptance. By accepting this bid the council did not abdicate its power in the premises or undertake to confer upon The Kerlin Brothers Company a right to fix the price of gas in the city, but it was simply an acceptance upon the condition that if they failed to come to an agreement upon a contract fixing their right to operate and the rates that they might charge, then the bids on the one hand and the acceptance on the other would fail and would not consummate the agreement. Now since that condition was not waived nor complied with during the life of that council, we hold that by virtue of the provisions of sec. 1691, Rev. Stat., that "The council shall not enter into any contract which is not to go into full operation during the term for which all the members of such council are elected," the transaction as to the inside property was not completed so as to go into full operation as a sale during the life of the council, and could not be completed subsequently by waiver of conditions or otherwise so as to validate the sales thereof.

8. We come now to the consideration of the last important question in the case, and that is as to the value of this outside property. We have spent several days in the hearing of testimony of witnesses and receiving other evidence as to the value of this property. It has taken a very wide range, and everything offered which was likely to reflect any light upon the subject was received and has been given consideration. The conclusions reached and already announced make it unnecessary for us to declare any finding as to the value of the property within the city, a problem into which enters the question of the value of the franchise and rate ordinances mentioned, and with respect to which witnesses have expressed the widest divergence of opinion, the estimated values of the privileges thereby to be conferred ranging from

some millions of dollars to absolutely nothing. As to the outside property this question does not enter into the problem, because (as before stated) we hold that the conditions expressed in the bid do not apply to to this property alone. But even as to this the estimates of value are widely apart. In view of the nature of the property we cannot regard much of the testimony as to value as more than estimates, since it is impossible to exactly determine the value as the property lies, a large part of it being beneath the ground. Consequently we do not find it possible to be precise or definite in stating our finding as to the value. We can only say that we find from the evidence—and here I only speak for a majority of the court—that it is probably of a certain value, and this is based on what the purchaser or the city could probably have obtained for it in the market as soon after the bid and acceptance as it was practicable to put it on the market, and we put this probable value at not more than $200,000.00. Mr. Philipps, an expert witness called on behalf of the city, puts the whole value of the property outside the city at $227,000. On the other hand, Mr. Kerlin—who appears to be an expert also on the matter of second-hand pipe and the cost of taking it up and laying it down and what may be done with it on the market, and what deterioration may be expected, puts the value of the whole property at about $122,000. Now these two estimates are about $100,000 apart, and they are perhaps the nearest together of those given by any of the witnesses produced by both parties. In point of information and ability to speak intelligently with respect to the value of this property, we believe they are the best witnesses produced . Mr. Kerlin, of course, is interested in the matter, and his interest must be taken into consideration in the weighing of his evidence. Mr. Kerlin took into consideration certain alleged proper discounts and freight charges and other losses and percentages, that are, to say the least, very liberal, reducing the value. On the other hand, we are of the opinion that Mr. Philipps omitted certain elements and considerations which should reduce his estimate. I will not undertake to discuss this in detail. He makes no allowance whatever for freight, in which he is perhaps correct. He makes no allowance for the removal of the pipe from the place where it would lie after taken from the ground, but he gave the value of it where it would lie after taken up, and he allowed but three cents a foot for taking it up, which we think is too low. We think he does not make a sufficiently large allowance for the cost of cutting off this shoulder of the pipe, which, according to the testimony of all the witnesses, must be done in order to make the pipe marketable and useful as pipe is now used ; nor for the joint which is required in order to make this a complete pipe, and other matters not mentioned in our judgment should modify his estimates, so that we think that the true and actual value of this pipe lies somewhere between the amount stated by Mr. Philipps on the one hand and that stated Mr. Kerlin upon the other. Now it is said by Mr. T. P. Brown, a witness for the city, that the purchaser of this pipe is " buying a pig in a poke," and Mr. Philipps testifies that after pipe has been in the ground for ten years, as this has, it is likely to be so much deteriorated that it is not safe to buy it at all until it has been uncovered, and that he would not undertake to bid on it on account of the uncertain condition of the pipe, until it had been taken up. No objection was made to his making this statement, but it was taken with other testimony of a like character perhaps not strictly admissible, but not objected to. Mr. Philipps testified that the life of pipe of this

character, buried as this is about fifteen years. If that is true, then two-thirds of the life of this pipe is gone. But he afterwards modified that by saying he thought he should have stated it at perhaps twenty-five years instead of fifteen; and if that is correct then two-fifths of the life of this pipe is gone, and that will certainly reduce the value of it very materially. But it is agreed upon all hands that you cannot tell much about the value of any certain line of pipe that is in the ground, as it depends upon various conditions. It may be said that the council should not have proceeded to sell this pipe in this way, as Mr. Brown puts it, "Like a pig in a poke." It has been suggested in argument that it would have been better for the council to have taken up this pipe and to have found out what condition it was in before selling it. That may be true, and yet it may be that if they had dug it up they would have found that they had something much less valuable than they supposed, and something that they could not obtain as good a price for as they have obtained for this.

The value of this pipe forms the most considerable part of the value of the outside property, but we have taken it all into consideration in our estimate. The leases are of but slight value. The pressure of gas, which affects in a somewhat corresponding ratio its volume, has fallen off in the fields from which the city has been drawing the most of its supply, from 375 pounds ten years ago to two pounds at the present time. In one part of the field—up about Dunbridge, the pressure was about 400 pounds and had been reduced to 35 pounds; but very little gas is brought from that section, the larger field is below, where the pressure has been reduced as I have stated. This shows the slight value of the gas leases. As a result of this falling off of gas the supply to the city has been reduced steadily and it has finally fallen so low that for the past year, as shown by undisputed testimony, the plant was run and at a loss of about $10,000; Mr. Heston, the manager, so testified; this is not taking into account the interest on the debt created no the establishment of this plant. The supply of gas, according to the testimony, continues to grow less day by day, and there does not appear to be any way to mend the matter, unless by discontinuing the business or by establishing a plant to manufacture gas for sale to the people of this city. Whether the latter plan would probably prove profitable is a question upon which witnesses differ widely. It is a question of policy to be determined by the proper city authorities, and with which we have no business whatever, except as the testimony of witnesses upon the subject tends to throw light upon the question of the value of the property. What has been said with respect to the recent results of the city's operating the plant in furnishing natural gas is enough to indicate clearly that for that purpose the plant is not valuable to the city, but quite the contrary, and unless it can be made more valuable by being devoted to the conveyance of artificial gas, its value is no more than what it will bring as second-hand material. Since the part beyond the city could not be utilized, as it lies, in connection with the distribution of artificial gas, and since the natural gas supply in the field to which it reaches is practically exhausted, it follows that the value of the outside part as second-hand material is its only value.

The fact that this property has been twice offered to the highest bidder—once in August, 1899, and again in December, 1899—in the methods required by the statute, and at times when the price of iron pipe of all kinds was higher than it has been for many years—the last

time the price being 25 per cent. higher than at the time of this hearing —and that the bids on both occasions by the different bidders were as near in amount to one another and to this last bid of the Kerlin Brothers Company as would be expected where honest competition prevails, helps us in arriving at a conclusion as to the value of this property.

When we give fair consideration to the unprofitable results which have accrued to the city therefrom, and the improbability of the market price of iron maintaining its present high stage, or at least that obtaining at the time at which the bid was submitted, and the chance taken by the purchaser with respect to the present condition of the property, and with respect to the condition of the market when he shall be able to put the pipe upon sale, and the fact that a purchaser has a right to count upon a fair profit in the transaction and will make his bid accordingly, we cannot find from the evidence that the price bid by the Kerlin Brothers Company was so far below the apparent fair market value at the time of the sale as to make the action of the council in selling it at that figure so reckless or improvident as to amount to an abuse of corporate power, or, in other words, an abuse of their discretion in the premises. Indeed, we seriously doubt, after hearing all the evidence, whether if this property were again offered, after the fullest publicity, it would bring a higher price than that for which it has been sold. It may be remarked that during the pendency of these public negotiatians, while the subject has been in every citizen's mouth, and not only the publication which was regularly made in one newspaper was given to the world, but the other newspapers of the city have had much in print upon the subject, so that the public has had an opportunity to keep close track of the proceedings, up to the time that this bid was accepted, and up to the present hour, so far as the evidence shows, after this second bid was put in by the Kerlin Brothers Company, no one had appeared to offer to the city one dollar more for the property.

Furthermore, on the first occasion when the bids mentioned were made, the Northwestern Ohio Gas Company, one of the bidders, was desirous of obtaining this pipe to use in extending its lines to Fairfield county, and said company, by purchasing, would not only have obtained the pipe which it desired, but it would have accomplished the closing out of the city as a competitor in the natural gas business, thereby leaving it without a competitor in the city, a result that certain witnesses seem to think would be worth millions of dollars to it, and that the city should receive millions of dollars for permitting, and yet for the plant inside and outside and the other possible advantages, this company bid but $228,000. One fact like this is worth more to a court intent upon discovering the truth than the mere estimates of a multitude of witnesses who cannot furnish reliable *data* as a basis for their opinions, and who do not risk or offer to invest a dollar in reliance thereon.

Now it cannot be said that it would not be worth while for anybody to appear and offer more, because when this transaction was closed it was within the power of the council under the statute to have sold that ground at a private sale at a price not less than this bid. It is a homely saying, but we think it has been used in this case quite appropriately with respect to the value of this property upon the market when you come to offer it for sale, as indicated by the bids and offers, and the absence of greater offers, that "The proof of the pudding is in the eating thereof."

Kerlin Brothers Co. v. Toledo.

There must be a clear abuse of corporate power upon the part or a legislative body to authorize a court to interfere, or to justify it in so doing. The administration of the affairs of the city is by the law entrusted to the council and officers of the city, and the council in matters of this kind is invested with a wide and extensive discretion, and so long as it keeps within its powers its authority is supreme and not subject to the supervision or interference of the courts.

It is not sufficient for us to find that a better price might have been obtained, or that in our judgment a different course should have been pursued. When we find that the course has been pursued that the statute marks out, and that the necessary steps have been taken, that is as far as we are authorized to go in that direction. To authorize us to interfere upon the mere ground that the price is not sufficient, it seems to us it should be so much less than would probably be obtained by again offering the property that it might be said by all men of fair judgment that the acceptance of the bid was a reckless and improvident act, and we do not think that that case is presented here.

I have spoken of the fact that according to the testimony of witnesses it appears that iron at this time had reached a very high figure, yet this was the best price which was offered and the best price which has been offered since; and that the price of pipe was not likely to remain at so high a figure, was a matter to be fairly considered and contemplated by those who were in the market buying and selling. That it was but the exercise of good judgment to assume, as we must suppose they did, that the prices would not remain at that figure, is evidenced by the fact that since that time it has fallen 25 per cent. as witness testify, so that the price is one-fourth less in the market than it was at the time this bid was accepted.

I will not extend the discussion farther. I have taken much time in the discussion of this case because of the importance of the questions and issues involved to the city and the inhabitants thereof as well as to The Kerlin Brothers Company and the interest manifested by the public, all of which have seemed to require or at least justify that course.

The judgment of the court is that there shall be an injunction issued in the equity case, with respect to the inside property only. The cross-petition in the replevin case will be dismissed. That will leave the replevin case still pending in the court below: And we are of the opinion that as the result is partly in favor of one contestant and partly in favor of the other, they prevailing respectively as to practically equal parts of the property, the costs should be equally divided.

HULL, J., dissenting.

I have been unable to agree with my colleagues in all of the conclusions at which they have arrived, and, in view of the importance of the questions involved in these cases, it has seemed to me to be my duty to state my views, orally and briefly, upon the questions concerning which I differ from the majority of the court.

It is my judgment that the same decree should have been rendered in this court that was entered in the court of common pleas, enjoining the sale of this property and plant both outside and inside the city, for the reason that the sale of the part of the plant outside of the city is invalid on account of irregularities in the proceedings of the council; and for the further reason that taking into consideration all of the irregularities in those proceedings, considering the price at which the prop-

erty was sold and the manner in which it was sold, the sale itself was an abuse of corporate power, within the purview of sec. 1777, Rev. Stat.

The application for an injunction in these cases is made by the city solicitor on behalf of the city or on behalf of the taxpayers of the city.

The judge of the court of common pleas found that the preliminary resolution which was introduced in the council looking toward this sale and directing the advertising of this property was a resolution of a permanent and general nature and that a resolution was the proper method of bringing this matter before the council, and that, therefore, it was necessary to proceed according to sec. 1694, Rev. Stat., and to have had that resolution read before the council on three separate days, or to have had such reading suspended by a three-fourths vote of the council. And this is also my judgment, if the council could proceed by resolution alone.

It is urged, however, that it was not necessary for the council to proceed in as formal a manner as by resolution. It is conceded that this sale, or attempted sale, is to be governed by the provisions of sec. 2673a, Rev. Stat. The council attempted to proceed under that section. A portion of the property at least being real estate, and a very large part of it appurtenances to real estate, and all being sold together, it is clear that the provisions of this section must control; and the section provides that before a sale is made certain things must be done by the council. It provides :

" That the council of any city or village, which has not a board of improvements, or board of public works, shall have power, three-fifths of all the members elected thereto voting therefor, to offer for sale or lease any real estate and appurtenances belonging to such city or village, and place the proceeds arising therefrom to the credit of such fund or funds as to said council may seem proper; provided that invitation for written bids for such sale or lease shall be first published for two weeks in some newspaper of general circulation," etc.

The council may offer for sale any real estate belonging to the municipality if they comply with the provisions of that section, and that section was passed after sec. 1692–34; and the purpose of it seems to be to provide in some manner for the sale of real estate and to lay down the steps that the council must follow in order to sell real estate. It provides that three-fifths of the members of the council elected thereto must vote therefore, so that some action of the council was necessary to bring the matter before it.

Section 1692–34, Rev. Stat., provides for the exercise of the power of sale. Section 2673a does not provide how this matter shall be brought before the council, and it has been said the council may act by ordinance, resolution or order, as provided in sec. 1655. They passed a piece of legislation, however, which was called a "resolution." They did not proceed by order, and in my judgment the word " order " in this section does not relate to such a proceeding as this, but is akin, in some respects, to the word " warrant;" and in that I am supported by Dillon on Municipal Corporations. They undertook to pass a resolution in order to bring this before the city council. It was evidently the judgment of the city council—the legislative body—that this was necessary. It was, apparently, the judgment of counsel who, according to the testimony, either prepared or superintended all of the proceedings in regard to this matter, that a resolution was necessary. And that is the way they proceeded. It has been suggested that they might have proceeded by

motion. But they did not so proceed, and I do not think it was the intention of the legislature that a matter of such importance as this should be brought before the council for its consideration in as informal a manner as a motion. It was not the purpose of the legislature in enacting this statute to provide that all that should be necessary to start proceedings to sell city property would be for a member of the city council to move that they sell the city hall, or sell the gas-plant or any other piece of public property, and that the clerk be directed to advertise for bids. A resolution is as informal a way at least as was intended by the legislature that the council should proceed, under this statute. In any event, they proceeded by resolution in this case, and it seems to me that when their action comes before a court the judgment of the legislative body as to the particular manner in which they should proceed —there being no express provision in the statute— is entitled to some weight.

If the resolution is of a permanent and general character, it must have been passed according to sec. 1694; have been read three times on separate days, unless suspended by a three-fourths vote of the council. Now this provision of sec. 1694 is a provision of great importance. It is not one that should be diminished or weakened by judicial construction. The powers that the council and municipal bodies have are such powers as have been conferred upon them by the legislature, and no others, and those powers, as the Supreme Court of this state has said many times, are to be strictly construed against the corporation, and whenever there is any doubt, as the court has said, and many other courts of last resort, that doubt is to be construed in favor of the taxpayers and against the council who are attempting to act. This provision of sec. 1694, Rev. Stat., is intended to restrict the council in the performance of such acts as are of a general or permanent character, intended to require deliberation and intended to require them to have such a resolution read at three separate and different meetings, to give the council an opportunity for discussing it and thinking about it, and to ascertain, if they see fit, the views of the people, who are their immediate superiors and principals, in regard to the action which they propose.

It seems to me that there can be no question but that this resolution was one of a permanent and general nature. It was a resolution that set on foot proceedings for the sale of property that cost the people of this community a million and a quarter of dollars. It was a resolution to begin proceedings that looked toward the taking from the public the title to this property and forever vesting it in private owners. It was a resolution in which not only every taxpayer but every inhabitant of this municipality was interested. The Supreme Court said in State v. Toledo, 48 Ohio St., 112, where the validity of the Toledo natural gas works statute came in question, on page 140 of the opinion:

" The natural gas works for which Toledo has issued its bonds, are owned and controlled by the municipality, and not by individuals. But every citizen, as a member of the community, has an interest in their construction, management and maintenance. The advantage resulting from them is tendered on equal terms to every inhabitant of the city. And the terms and conditions on which the benefits are to be enjoyed by the whole people are dependent largely upon the action of the people themselves. In our judgment, the taxation authorized by the general assembly for the payment of the bonds issued, was in no wise to subserve a private purpose, when used as language of constitutional limita-

tion. The establishment of natural gas works by municipal corporations, with the imposition of taxes to pay the cost thereof, may be a new object of municipal policy. But, in deciding whether in a given case, the object for which taxes are assessed is a public or private purpose, we cannot leave out of view the progress of society, the change of manners and customs, and the development and growth of new wants, natural and artificial, which may from time to time call for a new exercise of legislative power. And, in deciding whether such taxes shall be levied for the new purposes that have arisen, we should not, we think, be bound by an inexorable rule that would embrace only those objects for which taxes have been customarily and by long course of legislation levied."

And, on page 137 preceding this, the Supreme Court said, at the inception of this enterprise:

" Heat being an agent or principle indispensable to the health, comfort and convenience of every inhabitant of our cities, we do not see why, through the medium of natural gas, it may not be as much a public service to furnish it to the citizens, as to furnish water."

So that the Supreme Court held that not only every taxpayer but every individual of the municipality had an interest in the natural gas works, and seemingly set its approval so far as it could upon the plan which was then conceived to be for the advantage of the whole people.

It is not necessary for me to read from Campbell v. Cincinnati and Elyria Gas and Water Co. v. Elyria, *supra*, which have been cited by my colleague and which hold that any resolution of a permanent or general character must be read three times, on three separate days, unless the rule is suspended, and in default thereof that the action of the council is absolutely null and void. This court at its last term in this county, held that a resolution looking toward the ordering of the construction of a four-foot sidewalk in front of a fifty-foot lot was a resolution of a permanent character and must be passed according to sec. 1694. A resolution which resulted in the sale of property which had cost a million and a quarter dollars and in which every individual in the city was interested, is certainly a resolution of as permanent a character as a sidewalk resolution. The opinion of the judge of the common pleas court in these cases upon this question is full and complete and it seems to me that the argument which he makes supporting the proposition that a preliminary resolution was necessary and should have been passed according to sec. 1694, is unanswerable.

It is urged further, by the city solicitors and other counsel for the taxpayers, that before any steps were taken looking toward this sale or the beginning of the sale, an ordinance should have been passed, providing for the exercise of the power of sale of municipal property, and I am inclined to that view. No such ordinance was ever passed by the common council of the city of Toledo. Section 1692–34 provides for the exercise of the power of sale of public property by municipal corporations. It reads:

" In addition to the power specifically granted in this title, and subject to the exceptions and limitations in other parts of it, cities and villages shall have the general powers enumerated in this section, and the council may provide by ordinance for the exercise and enforcement of the same."

And subdivision 34 reads:

To acquire by purchase or otherwise, and to hold real estate, or any interest therein, and other property, for the use of the corporation, and to sell and lease the same.

In my judgment, under that section, before any steps can legally be taken by the council to sell the property of the municipality, the council must provide by ordinance for the exercise of that power. This is the language of the section, if we are to construe the word "may" as "must" or "shall," and it should be so construed. In the 14 Am. & Eng. Ency. Law, 979, the general rule is laid down thus:

"The word "may" in a statute is sometimes used in a mandatory and sometimes in a directory and permissive sense. It has always been construed as "must" or "shall" whenever it can be seen that the legislative intent was to impose a duty and not merely a privilege or discretionary power, and where the public is interested and the public or third parties have any claim *de jure* to have the power exercised."

And in 50 U. S. (9 How.), a decision of the Supreme Court of the United States, I read a few words from page 259, where the court quote from the language of an English case:

"Where a statute directs the doing of a thing for the sake of justice or the public good, the word "may" is the same as the word "shall;" thus, 23 Hen., 6, says the sheriff *may* take bail; this is construed he *shall*, for he is compellable to do so."

"Without going into more details, these cases fully sustain the doctrine, that what a public corporation or officer is empowered to do for others, and it is beneficial to them to have done, the law holds he ought to do. The power is conferred for their benefit, not his; and the intent of the legislature, which is the test in these cases, seems under such circumstances to have been "to impose a positive and absolute duty.""

The question is discussed quite fully in Mechem on Public Officers, sec. 593. The last paragraph of the section, quoting from Chief Justice Nelson, of New York, is as follows:

"The inference deducible from the various cases on this subject seems to be that where a public body or officer has been clothed by statute with power to do an act which concerns the public interest or the rights of third persons, the execution of the power may be insisted on as a duty though the phraseology of the statute be permissive merely and not peremptory."

This statute, therefore, should be read that municipalities shall have the power to acquire and dispose of real estate and, they *must* provide by ordinance for the exercise of the same. Now, *when* must they provide by ordinance for the exercise of this power? After the sale is made? After the advertisements have been published? After bids have been made? After proposals have been accepted? After everything is done but the transfer of the purchase money into the city treasury and the order to the mayor to make a deed? The time to provide for the exercise of this power is before the municipality begins to exercise the power.

Section 2673a provides that before this property can be sold they must advertise it. That they undertook to do. It seems that after the advertising of the property for sale, and the offering of it for sale to The Kerlin Brothers Company and others, under this section, it might have been sold either at public auction or upon written bids as was done in this case, and the offering of it for sale was as much a part of the sale as the acceptance of the proposal of Kerlin Brothers. The offer to sell

and the advertising for bids are necessary parts of the sale under this section. After the property had been offered for sale and the bids had been received and opened a resolution accepting the Kerlin bid was passed, and it is urged that that is an " ordinance " providing for the exercise of the power of sale, and that therefore this statute has been complied with. This has been read. It reads, including the title, as follows :—

" Resolution accepting the bid of the Kerlin Brothers Company for gas plant lying outside of city of Toledo.

" Resolved by the Common Council of the City of Tolede, Ohio, that the proposal of the Kerlin Brothers Company, for the purchase of all that part of the property (as advertised) owned, used or connected with the City Natural Gas Plant lying outside the city of Toledo," etc. (And then it describes it) " at the price of $102,000, be and the same is hereby accepted and upon the payment of the purchase money, the mayor and city clerk are hereby authorized and directed to execute and deliver to the said The Kerlin Bros. Company, proper deeds and conveyances of all of said property."

I am unable to reach the conclusion that that is an ordinance. Evidently the council did not regard it as an ordinance when they were passing it, because they denominated it a " Resolution," and whoever drew it did not regard it as an an ordinance. It does not contain the formal parts of an ordinance, nor is it within any of the definitions of an ordinance. An ordinance is a law of some kind. It is so defined by Dillon. It is a by-law of the corporation for the government of the people or for the government of the council. It has been defined by our Supreme Court, as has been read, as a piece of legislation that lays down a permanent rule of conduct, as distinguished from a resolution, which is only temporary in its character. I am unable to see anything in this resolution which simply accepted the bid which had been made by the Kerlin Brothers Company and directed that the property should be turned over to them, anything that savors of an ordinance or of a permanent rule of conduct. The publishing of it did not change its character and make it an ordinance. It is exactly what it appears to be upon its face—a resolution of acceptance of this bid, and cannot be construed to be an ordinance providing for the exercise of the important power of sale of property belonging to the municipality. It rather falls within sec. 1693, following 1692, which provides that: " No contract, agreement or obligation shall be entered into except by an ordinance or resolution of the council." The sale had been made, so far as it could be made, and everything done except the acceptance of the bid, which consummated the sale, and the receipt of the money, the making of the deed and the turning over of the property.

Upon this question of what constitutes an ordinance, I cite Dillon on Municipal Corporations, sec. 307 ; Blanchard v. Bissell, 11 Ohio St., 96 –103 ; 32 Kan., 456, 467, 463. The Supreme Court of Kansas there held that if an ordinance was required, a ratification by ordinance was not sufficient; the court say:

" A majority of the court hold that the mayor and council are themselves only agents, and in providing for street improvements to be paid for by abutting lot owners, can only act in strict accordance with the powers delegated to them ; and if they act in some other mode than that provided for by statute, as by resolution, where they should act by ordi-

nance, their acts are utterly null and void, and cannot be subsequently ratified or confirmed by ordinance or otherwise."

If there is any doubt whether this was an ordinance or not; if there is a doubt as to whether an ordinance is required, under the authorities, that doubt should be resolved in favor of the taxpayers and against the exercise of the power, 1 Dillon on Municipal Corporations, sec. 89, and the language here used has been practically adopted by our Supreme Court in Ravenna v. Penn. Co., 45 Ohio St., 121. Dillon says:

"It is a general and undisputed proposition of law that a municipal corporation possesses and can exercise the following powers, and no others: First, those granted in express words; second, those necessarily or fairly implied in or incident to the powers expressly granted; third, those essential to the declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation and the power is denied."

I am of opinion that before this power of sale could be exercised in any respect it was necessary that the council should pass an ordinance providing for the same, and I am unable to arrive at the conclusion that this paper which was denominated a resolution—the acceptance of The Kerlin Brothers Company bid—was an ordinance providing for the exercise of such power of sale, and for that reason the proceedings for the sale and the attempted sale, in my judgment, were null and void, both as to the outside and the inside property.

It is also charged that the council was guilty in this transaction of an abuse of corporate power. Section 1777, Rev. Stat., provides: He (the city solicitor) shall apply in the name of the corporation to a court of competent jurisdiction for an order of injunction to res'rain the misapplication of funds of the corporation or the abuse of its corporate powers * * * This question was not presented in the common pleas court, as no evidence was offered in that court except upon the alleged irregularities in the proceedings of the council. The proceedings looking towards the sale of this plant covered some time, evidently; for the evidence shows that in July, 1899, the council took steps to have this property advertised for sale, and in considering whether the council has been guilty of an abuse of corporate power, it is necessary to speak briefly of what was done with reference to the whole transaction.

As has been said by my colleague, whether it was good policy or not to dispose of this plant, is a matter which is undoubtedly committed by the law to the judgment and discretion of the council. All of the court agree, under the law as it stands, that the council, if it proceeds according to law, may sell the property without the concurrence of the gas trustees. A section of the statute provides that waterworks can not be sold without the concurrence of the waterworks trustees, and that school property cannot be sold without the concurrence of the board of education, and that infirmaries cannot be sold but with the concurrence of the board; but, for some reason, or from oversight the legislature did not provide that this property could not be sold without the concurrence and approval of the gas trustees. It would have been a very wise provision had the statute provided, as it does in the case of waterworks, that the gasworks should not be sold without the concurrence of the trustees who had been elected by the people for the purpose of managing this property, some of whom had

been members of the board for many years, and the entire plant being an institution established by a vote of the people—for, upon examination of the statute, we find that it required a vote of sixty per cent. of the voters voting thereon to authorize the issuance of the bonds. It might be presumed that these trustees, among whom, were some of the most prominent citizens of the community and who had given these questions much consideration, they might be presumed to have more knowledge of what would be best to do with this plant than men who had recently been elected to the council and who had had no experience in such matters, and it would have been a very proper act of the council to have sought the advice of the gas trustees in regard to selling the property and plant, but the statute does not require that. In July of last year this property was first offered for sale. The highest bid then was $256,000. After the bids were opened, the mayor of the city, as he testified, in order to save the property from sale to private owners and being sacrificed at what he regarded as a disproportionate price, filed, within ten days, a cash bid for these two properties, of $300,000, and was ready and willing to take the property at his bid of $300,000, and further offered to agree that the city might have the property back whenever it desired to purchase it from him, at what it had cost him. The council might have accepted this bid, under the law, as the statute gives the right to accept any bid within twenty days as high as the highest bid filed. But the council rejected the bid of $300,000 and rejected all bids, and in October again advertised the property for sale.

By section 2673a, as has been said, it is only required that advertisement be made for two weeks, in some local newspaper, and there was no statute providing that the council should advertise for bidders for this immense plant in different parts of the country, as a private owner would have done or as a receiver would have been ordered to do, to secure bids from men interested in such enterprises all over the United States. But it was advertised for two weeks again, in a local paper only, and bids were again made, two only, one of them being the bid now under consideration in this case, and which contained a condition, among others, that the council should pass a rate ordinance fixing the price of gas to the satisfaction of the Kerlin Brothers Company, a condition wholly unlawful and void, and the council might have entirely disregarded the bid for that reason—for it certainly had no power or authority under the law to agree with The Kerlin Brothers Company that the council would pass an ordinance fixing the rate for the price of gas satisfactorily to them. This bid was afterwards accepted and the council thereafter did pass an ordinance giving them a perpetual franchise in the streets of the city of Toledo, and passed an ordinance fixing a rate for the price of gas satisfactory to The Kerlin Brothers Company; so that the city council did everything in their power to carry out the unlawful and illegal part of this bid. As has been said by my colleague, the life of the council expired before this ordinance required by The Kerlin Brothers Company could go into effect, and therefore it and the attempted sale of the inside plant became null and void, but it was a part of the power attempted to be exercised by the city council and a part of their conduct in relation to this matter, and they sold, or attempted to sell to The Kerlin Brothers Company the inside property for $126,000 and the outside property for $102,000, a total of $228,000.

As the inside property is held by all the court not to have been legally sold, it is not necessary to discuss its value. Under the undis-

puted evidence in this case, the property had enhanced in value from forty to sixty per cent. during the period from July or August to December, 1899, when the property was sold to the Kerlins, say fifty per cent. Pipe had advanced to a very high price. It was scarce, and new pipe was in great demand, and, as witnesses say, second-hand pipe sold readily —for many who needed pipe could get nothing else. The mayor's offer in July, to save the property from sacrifice, was $300,000; by December the property had advanced fifty per cent. in value and was then sold for $72,000 less than the mayor's bid in July.

There was a large amount of testimony offered here as to the value of this plant and property outside of the city bearing upon the question of the abuse of corporate power. There were some seven witnesses called, five on the part of the city and two for the defense. Although the question as to the exact value of this property, as has been said, is somewhat difficult to answer, yet experienced men, who have bought new pipe, who have laid it in the ground and who have seen it after it came out, and who knew the nature of it, are able to tell pretty nearly what it is worth, and the only way that a court can arrive at its value is to take the evidence here and from it reach a conclusion. Upon this question, for the defense, R. G. Kerlin, the president of the defendant company, testified, and one witness from Indiana by the name of Driscoll, who is in Kerlin's employ, or in the employ of a company in which Kerlin is interested. Taking all of the testimony together and averaging it, as is sometimes done would make the value of this property outside of the city $325,000—in round numbers. Mr. Grossweiler, who had had sixteen years' experience in the business, and who is now connected with the Toledo Gas & Fuel Company, and who was six years purchasing agent for that company and was perfectly familiar with prices, gives his estimate of the value of the pipe at about $225,000; which was about fifty per cent. of the value of new pipe; and I may say that new pipe at that time had as stable and fixed a selling price and specific value as wheat, and when the value of the other property is added, it makes a total of about $235,000. The mayor of the city, Mr. Jones, who testified that he had had large experience in the gas business since 1865, and in both new and second-hand pipe, that he had employed many men and carried on a large business, made a careful estimate of the value of this plant outside the city and testified that in his judgment it was worth $400,000, to dismantle, take up and sell on the market. Mr. T. P. Brown, who was a gas trustee for some years, testified that in his judgment it was worth $575,000. Mr. Edwin D. Philipps, brought here from Columbus, who appeared wholly disinterested, who was for sixteen years in the natural gas business, estimates the entire value of the plant outside at $236,000, and in round numbers, the pipe-line alone, about $225-000. Mr. William P. Heston, who has been the manager of the natural gas plant ever since its inception and who probably had as good an actual knowledge of this pipe as any one who was called, estimated the value of the plant outside the city at $600,000. These estimates were all of its value to dig up, dismantle and sell. Mr. Driscoll, who came here from Indiana, and who was in the employ of the Kerlins, and Mr. Kerlin himself were the only witnesses called by the defense on the subject, and they testified that in their judgment, when everything was taken out that should be allowed, it would be worth $122,107. In arriving at these figures they were obliged to take out ten cents per foot for taking the pipe out of the ground, which would make $42,000, while other witnes-

ses estimated this expense at three cents per foot; and they also deducted $10,000 for possible freight that they might be compelled to pay to ship the pipe to different parts of the country. Neither Mr. Kerlin nor Mr. Driscoll, his employee, could be said to be disinterested. Mr. Philipps seemed to be entirely disinterested and a man who was entirely fair and without political interest in the question, and after a careful computation in the presence of the court, gives his estimate at $236,383. Mr. Grossweiler, who is wholly disinterested and a man of experience, as I have said, gives his estimate of the pipe alone at $225,556, and when there is added to this the other things that should be taken into consideration, his estimate runs up to about $235,000, adding to his valuation of the pipe the value Mr. Kerlin himself put upon the telephone line, buildings, boilers, pumps, etc. Now there are two witnesses who are wholly fair and disinterested and entirely removed from any feeling whatever in the matter, and they give it as their judgment that this property is worth from $235,000 to $240,000.

Now it should be presumed that the council knew the value of this property before they undertook to sell in this manner; that they informed themselves as to the probable value of the property which they undertook to sell to the Kerlin Brothers Company for $102,000 which from the evidence was worth at the very least $225,000. The sale of property for so grossly inadequate a consideration as this, in my judgment constitutes an abuse of corporate power, and that it should be so held by the court. Allowing to the Kerlin Brothers Company what should be considered as a large profit, say $25,000, there is here over and above any legitimate profit, $100,000 of property that belongs to the taxpayers of this municipality turned over practically as a gift to the Kerlin Brothers Company.

While it may be said, and it has been said, that this value is to some extent uncertain, yet it has been made as certain to this court as human testimony could make it, by the evidence of men who had had the widest experience and who appear to be frank, honest and truthful. The defendant was given every opportunity to call witnesses, and it called none except Kerlin himself and an employee, while the city called five witnesses, all without any pecuniary interest in the case except as taxpayers. The average value of this property, taking all of the witnesses together, is, as I have stated, over $300,000 and its very lowest value is certainly $225,000. Can it be said that the sale of this immense property for less than half its value, and at a loss to the city of $100,000, is not an abuse of corporate power? If it is not, then that provision had better be stricken out of the statute. It is put there for some purpose. It should be construed, not strictly against the taxpayer, but liberally in his behalf and strictly against his agents who are handling and selling and disposing of his property. The fact that the plant is being run at a loss on account of the decrease of the supply of natural gas, is no reason or excuse for selling the pipe and other property for half their value.

There have been some decisions upon this question, and I will call attention to one of them. I refer to a New York case, found in 5 New York Supplement, a decision of the Supreme Court of New York. The court say, in a case where property was about to be bought at a price one-fourth more than it was worth:

"For a mere error in judgment, involving no greater difference than might exist between persons purchasing property for themselves,

Kerlin Brothers Co. v. Toledo.

the court would not be required to interfere and restrain the purchase under the statute, but for so large a difference as appears here the case requires to be otherwise considered. It involves an appropriation of a large sum of money belonging to the public, for which no equivalent is to be received by the city, and it is accordingly, in all substantial respects the gift or donation of so much money to the person from whom the property is proposed to be purchased. This the law will not permit. It requires the same fidelity, care and caution on the part of the individual representing the public interests as would be expected to be used by an individual purchasing the like property for himself and paying for it with his own money. In all public positions the law not only expects, but it exacts, this degree of care and fidelity from those representing public interests, and it is because these expectations have not always been realized, and the obligation has not been observed, that the statutes have been passed, allowing the taxpayers to institute suits in their own names to prevent the misappropriation of public moneys or public property. It has been found necessary, in addition to the obligations imposed upon public officials, to subject them to this restraint and oversight on the part of the taxpayers, not only to keep down their own expenditures and burden, but to exact from the officials a complete and careful discharge of the duties imposed upon them by the laws."

The court held that it was an abuse of corporate power calling for the interference of the court when property was to be purchased for one-fourth more than its value; and what shall be said when property is sold for less than one-half its value, at a loss to the city of more than $100,000?

I am unable to avoid the conclusion that under sec. 1777, taking all these things into consideration, here was an abuse of corporate power which calls for the action and intervention of the court. In my judgment the city solicitor was fully warranted and justified and simply did his duty in applying to the court in the name of the taxpayers and people, to protect them from their agents who were thus disposing of their property.

*E. W. Tolerton* and *Hamilton & Kirby*, for plaintiffs.

*M. R. Brailey*, city solicitor, for defendant.